**In re Bruce Lee JENNINGS, Debtor.**

**Brandon James Maxfield, Plaintiff,**

v.

**Bruce Lee Jennings, Defendant.**

**Bankruptcy No. 03–4926–3F1.**
**Adversary No. 03–337.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

June 20, 2006.

Ned R. Nashban, Quarles & Brady LLP, Boca Raton, FL, for Debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This proceeding came before the Court upon the complaint filed by Brandon James Maxfield ("Plaintiff") objecting to the discharge of Bruce Lee Jennings ("Defendant"). The Court conducted a trial on July 22, 2005 and August 2, 2005. In lieu of oral argument, the Court directed the parties to submit legal memoranda in support of their respective positions. Upon the evidence and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Defendant is the sole shareholder of B.L. Jennings, Inc. ("B.L.Jennings"), a firearms distributor. (Pl.'s Ex. 146 at 129.)[1] Although he was not technically an officer of Bryco Arms ("Bryco"), a handgun manufacturer, Defendant was involved in its day-to-day operations and served as a consultant to the company since its inception. (Id. at 130.) Bryco sold its handguns mainly to B.L. Jennings. (Id.)

On April 6, 1994 Plaintiff was injured in an accidental shooting involving a handgun designed by Defendant, manufactured by Bryco, and distributed by B.L. Jennings. The accident occurred approximately five days after Bryco's insurance lapsed. (Id. at 131.) Neither Defendant nor B.L. Jennings maintained insurance. (Id.)

In approximately May, 2001, Plaintiff commenced an action in California Superior Court ("the California litigation") seeking damages against Bryco and B.L. Jennings, among others. (Pl.'s Ex. 11.) On or before October 18, 2001, Plaintiff added Defendant as a defendant in the California litigation alleging that Defendant defectively designed the handgun, which injured him. (Pl.'s Ex. 17.) The California litigation was "by far and away the largest lawsuit in terms of damages potential that [Defendant, Bryco, or B.L. Jennings] had ever faced." (Pl.'s Ex. 146 at 39.) Plaintiff also sought to recover from the assets of Janice Kay Jennings, RKB Investments, and Janice K. Jennings as Trustee for the following Trusts: the Rhonda D. Jennings California Trust, the Kimberly K. Jennings California Trust, the Bradley A. Jennings California Trust, the Rhonda D. Jennings Nevada Trust, the Kimberly K. Jennings Nevada Trust, and the Bradley A. Jennings Nevada Trust (collectively "the Alter Ego Parties") any judgment liability obtained against Defendant, Bryco, and B.L. Jennings under joint venture/enterprise, partnership, and alter ego theories.[2]

---

1. By order dated July 1, 2005 the Court admitted certain portions of the transcript from the April 8, 2004 and April 9, 2004 hearings on [Plaintiff]'s objection to [Defendant]'s claim of exemptions. They were admitted as Plaintiff's Exhibits 146 and 147.

2. Janice Jennings is Defendant's former wife. In May 1981 Defendant and Janice Jennings established the Kimberly K. Jennings California Trust and the Rhonda D. Jennings California Trust. In February 1983 Defendant and Janice Jennings established the Bradley A. Jennings California Trust. Defendant is the father of Kimberly K. Jennings, Rhonda D. Jennings, and Bradley A. Jennings, the respective beneficiaries of the California trusts. Janice is the mother of Kimberly K. Jennings and Bradley A. Jennings.

In May 1987 Defendant and Janice Jennings established the Kimberly K. Jennings Nevada

During January 2002, Defendant met with Ned Nashban, a bankruptcy attorney in Boca Raton, Florida. (Pl.'s Ex. 27.) Defendant testified that the purpose of the meeting was to obtain estate-planning advice. On January 29, 2002, Defendant made an offer to purchase a home (the "Spruce Creek property") in Spruce Creek, a fly-in community in Daytona Beach, Florida, for $925,000.00. (Pl.'s Ex. 31.) The offer was accepted and the transaction closed on February 15, 2002. (Pl.'s Ex. 35.) Defendant paid cash for the house. (Pl.'s Ex. 147 at 237.) Defendant testified that he has always paid cash for houses. (*Id.*) Between May 14, 2002, and March 5, 2003, Defendant spent approximately $84,377.47 refurbishing the Spruce Creek property. (Pl.'s Ex. 93.)[3]

On March 5, 2002, Defendant purchased a $500,000.00 annuity. In Findings of Fact and Conclusions of Law dated September 22, 2005, the Court found that Defendant purchased the annuity with the intent to hinder, delay or defraud Plaintiff and that the purchase was therefore a fraudulent transfer.

In November or December of 2002, Defendant decided to enlarge the hangar adjacent to the Spruce Creek property. (Tr. at 358.) Defendant hired Baker Builders to complete the project. On March 10, 2003, Defendant signed a notice of commencement to enlarge the hangar. (Pl.'s Ex. 87.) On March 11, 2003, Frank Baker ("Baker"), the president of Baker Builders, prepared a construction cost summary sheet, which he provided to Defendant as a guide to the expenses to be incurred in the construction of the hangar. (Pl.'s Ex. 86.) The sheet described and estimated the cost of each task and estimated the total cost of the project at approximately $202,000.00. (*Id.*) On March 31, 2003, the parties entered into a contract, which provided, among other things, that "capital for the construction expenses will be paid in increments of Fifty Thousand Dollars ($50,000) and a complete accounting of those funds will be presented before any additional capital will be funded." (Pl.'s Ex. 85.) On that same day Defendant gave Baker Builders a check for $5,000.00. (Def.'s Ex. 80.)

The court in the California litigation entered an order dividing the litigation into three phases. The first phase was to determine liability. The second phase was to establish damages. The third phase was to address the joint venture/enterprise, partnership, and alter ego claims. On April 21, 2003, the jury in the California litigation returned its verdict in the first phase, finding Defendant 15% liable for Plaintiff's injuries, B.L. Jennings 10% liable for Plaintiff's injuries, and Bryco 10% liable for Plaintiff's injuries. (Pl.'s Ex. 22.) On April 23, 2003, Defendant traveled to Europe. (Tr. at 367.) At that time he was aware of the liability verdict. (Tr. at 371.) Defendant returned from Europe on the

Trust, the Bradley A. Jennings Nevada Trust, and the Rhonda D. Jennings Nevada Trust. In approximately 1988 the Kimberly K. Jennings California Trust, the Rhonda D. Jennings California Trust, and the Bradley A. Jennings California Trust created RKB, a partnership.
Rhonda Jennings turned 25 sometime in 1992 or 1993 at which point the Rhonda D. Jennings California Trust ceased being a partner in RKB and Rhonda Jennings received her share of the equity in RKB.

(March 23, 2004 Findings of Fact and Conclusions of Law on [Plaintiff]'s Motion to Convert [Defendant]'s Case from Chapter 11 to Chapter 7.)

3. Plaintiff's Exhibit 93 totals $102,194.76 but includes all expenditures related to the Spruce Creek property beginning on March 12, 2002 and includes items such as lawn care and pool maintenance.

evening of May 4, 2003. (Tr. at 367.) Defendant testified that upon his return from Europe, he intended to travel to California to prepare for phase three of the California litigation.

Defendant testified that upon his return from Europe he expected to see the grading and foundations for the hangar poured. (Tr. at 368.) They were not. (*Id.*) Defendant testified that when he called Baker the evening of May 4, 2003 or the morning of May 5, 2003 to inquire why the construction had not begun, Baker informed him that "he hadn't obligated himself and that I hadn't give him the funds to go forward." (Tr. at 368.) "So my understanding was the reason was that [Baker] hadn't done work on the house while I was gone, or should I say the hangar project, was because he hadn't received moneys sufficient to start doing the concrete work." (Tr. at 369.) Defendant testified that he was "very, very anxious" to get the hangar project going. (Tr. at 82.)

On May 5, 2003, Defendant withdrew $130,000.00 from his Bank of America Account 005484922301 (the "Bank of America account") to purchase a $130,000.00 cashier's check payable to Baker Builders. Defendant testified that he arrived at that amount by calculating what he thought it would cost to complete the dry in portion of the hangar, that is, the concrete, walls, roof, and windows, so that it would not be vulnerable to wind and rain. (Tr. at 369–370.) Defendant testified that although he understood the contract with Baker Builders required only the payment of $50,000.00, he decided to give Baker $130,000.00 because he believed he would be in California for two months for phase three of the California litigation and did not want to be burdened with managing the construction of the hangar from afar. (Tr. at 393–394.)

On that same day Defendant hand delivered the check to Baker. Defendant testified that giving Baker a cashier's check would "save a week or so of waiting for checks to clear." (Tr. at 82.) At that time Defendant believed the permit for the hangar had been issued. (Tr. at 367.) In fact, the permit was not actually issued until June 11, 2003. (Pl.'s Ex. 88.) As of May 5, 2003, Baker Builders had only spent $651.52 on the hangar project. (Pl.'s Ex. 89.)

At the April 9, 2004 hearing on Plaintiff's objection to Defendant's claim of exemption Defendant explained that he paid the $130,000 to save money and move the project forward. Defendant stated:

> Well Frank and I had a meeting, and we were talking about what I could do to save money and move the project forward. And it was decided that, if I would pay him the money that he was about ready to spend, he could take and get the contractors that were very busy to get them out earlier and get the project going if he had the money in his hand, and he could negotiate better pricing and be prepared to move the project forward faster, and possibly even get some discounts on our work because we were well funded and ready to go.

(Pl.'s Ex. 147 at 290–291.) When asked why he didn't pay more than the $130,000 Defendant indicated that "[b]ecause what [Baker] and I negotiated to was only 130."

Plaintiff deposed Baker on July 27, 2004. The following line of questioning occurred during the deposition:

Q Now going back to your original payment arrangement with Mr. Jennings, when would he have been required to give you the initial installment of $50,000?

A Right away, up front.

Q On what date?

A Any time prior to, lets say April 1st, for example.

Q But he didn't pay you on April 1st?

A Well, the $5,000, for example was enough to get me started through the preliminary thing, as I already stated, but down here somewhere along the way-let's see, I have to go back to the deposit. On 5/5 he gave me the 130, so you can look down here and see that on 5/2 I had already utilized-well actually down-I had used some of this $5,000 and then the biggest expense in the beginning was the clearing of the property, 3,000 and that was on June 3rd. So he gave me the 130,000 on the 5th of May, approximately, and we started doing work but we didn't really have the permitting yet, because if you put the things together we didn't get it until June.

Q Correct.

A So all of that initial expense, now [ ] Baker, Baker Builders, as well as [Defendant] didn't know it was going to take us six or seven weeks to get the permit when we put in for the permit.

Q Right.

A So consequently [Defendant] put the money in place thinking that I would probably have spent more in the initial particular, you know, that I would have had the permit and the project would have been underway probably at least five to six weeks prior to the date it actually started.

Q Did he say that to you?

A No. But I mean I just said that Baker, Baker Builders the entity and [Defendant] the individual, did not anticipate any of those three entities, did not anticipate the length of process to procure the permit.

Q I understand that.

A And he wasn't even here while those things were going on.

Q Let's take the permitting delay and expectations out of the equation for a minute. At what point would you have normally gone to [Defendant] and said [ ] it's time for your $50,000 deposit.

A It would have been rather quickly in the deal. In other words, it would have probably been somewhere after the $5,000.

(Pl.'s Ex. 91 at P. 31, Line 22–P.33, Line 25.)

Q When you wrote this letter on March 29, 2003, what were your expectations as to when the installments would be due?

A The installments would be due in lots of 50 grand and these are the ledger sheets that would indicate when I spent 50, that would be the documentation that it says I would provide.

Q So if I'm hearing you correctly, are you saying that when the first $50,000 is due up front but then when you've exhausted that you would go up to [Defendant] again and document that you spent 50,000 and then request another 50,000?

A Correct. It would happen a second time and a third time and so on and so forth.

Q But you had no expectation of receiving the second installment of 50,-000 until you had roughly spent that much on the project?

A Basically, if [Defendant] would have been in town we could have done it in the $50,000 increments because he's right there. So I show him hey look, I got a list-I got a pile of bills here, here's the document that the

first 50 is gone, your second 50 is about to be gone as soon as I pay these so I need the money. I'd pay those and then get another list of the things just like you have here. But because he was going to be out of town for a certain length of time, whether it was plus two months or minus two months that was the initial thing. Hey, I got-I'm going to California, I might not be back for two months, I'm going to give you 130,000, maybe because he didn't have 150,000 or whatever. I mean I don't know how he got to the 130 figure but he thought that would be enough money to carry me during the time period he would be away.

Q Did he express that to you when he delivered the check; is that what he said?

A Yeah, instead of giving you 50 I'm going to give you 130 because I'm going to be gone for two months. He's expecting this thing to go up like Lego, that plastic stuff you put and it gets done in a matter of hours instead of months. But, I mean I didn't think anything of it, let's put it that way and at this particular time I didn't know what he was doing or what he did even.

Q But outside [Defendant]'s purported trip to California you would have not come to him for the second $50,000 until he had-until you had spent roughly that amount of money on his project.

A That's typically correct. That's what the contract, I think, says.

(Pl.'s Ex. 91 at 36–38.)

Baker testified that he never suggested to Defendant that he would realize any savings if he prepaid the $130,000.00. (*Id.* at 45.)

On May 7, 2003, the California court entered a damages verdict of approximately $50 million. (Pl.'s Ex. 23.) On that same day Defendant withdrew $100,012.48 cash from his Bank of America account. (Pl.'s Ex. 81.) Defendant testified that he did so because:

> [he] wasn't sure what was happening with the finances in [his] world, and there was a lot of discussion that had just started that talked about the filing of the bankruptcies. And all this came on [him] very suddenly, and [he] was not real sure if the courts were going to come in and lien all of the accounts that [he] had or close them down. And [he] had made a decision that [he] would withdraw some money that [he] could have in case all the accounts were closed, [he] would have living expenses that were in cash.

(Pl.'s Ex. 147 at 296.)

Some of the $100,012.48 was disposed of as follows. On May 10, 2003, Defendant paid $3,000.00 in cash to Kane's furniture. (Def.'s Ex. 83.) On May 11, 2003, Defendant paid $3,476.97 in cash to Stone Giant for countertops. (Def.'s Ex. 91.) On May 12, 2003, Defendant paid $190.64 to Kane's furniture. (Def.'s Ex. 83.) On May 14, 2003, Defendant paid $2,367.00 to Circuit City for a television. (Def.'s Ex. 33.)

On May 12, 2003, Defendant deposited $17,000.00 into his Bank of America account. (Pl.'s Ex. 92.) On May 13, 2003, Defendant deposited $20,000.00, which he used to pay attorney's fees, into the Bank of America account. (*Id.*) Defendant testified (and there is no evidence to the contrary) that these deposits were from the $100,012.48 which he withdrew on May 7, 2003 and that he did not get any money from other sources that could have been deposited into the Bank of America account. (Pl.'s Ex. 147 at 296–299.)

On May 13, 2003, the court in the California litigation entered a judgment individually against Defendant in the amount of $21,250,650.31. (Pl.'s Ex. 22.) On May 14, 2003 (the "Petition Date"), Defendant, Janice Jennings, Bryco, B.L. Jennings and the Alter Ego Parties filed voluntary Chapter 11 bankruptcy petitions.

On the Petition Date Defendant withdrew $14,498.06 from his Bank of America account. He used $5,448.18 of that to purchase a cashier's check payable to Pino Tile. (Def.'s Ex. 86.) He used the remaining $9,049.88 to pay his Chase credit card. (Def.'s Ex. 76.)

Defendant filed his bankruptcy schedules and Statement of Financial Affairs ("SOFA") on June 20, 2003. (Pl.'s Ex. 1.) On Item 1 of Schedule B, which requires a debtor to list cash on hand, Defendant indicated he had $50,015.00 cash on hand.[4] On Item 11, which requires a debtor to list "[i]nterests in IRA ... or other pension or profit sharing plans", Defendant indicated none. On Item 12 of Schedule B which requires a debtor to list "[s]tock and interests in incorporated and unincorporated business", Defendant listed his 100% stock ownership interest in B.L. Jennings. Defendant did not list ownership in any other businesses. In response to Question 10 on his SOFA, which requires a debtor to list property, "other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately proceeding the commencement of the case", Defendant indicated none.

In June, 2003, Defendant opened a Debtor in possession account at Regions Bank (the "Regions Account"). (Def.'s Ex. 21.) On June 3, 2003, Defendant deposited $15,000.00 into the Regions account. (Tr. at 463–464.) On June 23, 2003, Defendant deposited $10,000.00 into the Regions account. On July 23, 2003, Defendant deposited $15,492.00 into the Regions account. On August 13, 2003 Defendant deposited $9,000.00 into the Regions account. (Tr. at 464–465.) Defendant testified (and there is no evidence to the contrary) that these deposits were from the $100,012.48 which he withdrew on May 7, 2003 and that he did not get any money from other sources that could have been deposited into the Regions accounts. (Tr. at 466.)

### Jennings Racing and the Mad Max

Jennings Racing was an Oregon corporation, which Defendant formed during 1995 to purchase the Mad Max, a yacht. (Tr. at 60.) Its purpose was to purchase assets without having to pay sales tax in various states. (Tr. at 520.) Jennings Racing never issued stock certificates, never conducted any business, and never had a permanent address. (Tr. at 60.) On February 13, 2002, Defendant answered interrogatories served on him by Plaintiff in the California litigation. In response to number 5, Defendant indicated that he owned 100% of Jennings Racing. (Pl.'s Ex. 34.)

On April 18, 2002, Defendant purchased a WACCO airplane. (Pl.'s Ex. 50.) Although he individually funded the purchase, Defendant listed Jennings Racing as the buyer on the aircraft purchase agreement. (Id.) Defendant testified that he listed Jennings Racing as the buyer because he wanted to save approximately $15,000 in Florida state sales tax. (Tr. at

---

**4.** Defendant explains that $50,015.00 was what remained of the $100,012.48 withdrawal after taking into account the payments to Kane's Furniture, Stone Giant, Circuit City, the $17,000.00 May 12, 2003 deposit back into the Bank of America account, the $20,000.00 May 13, 2003 deposit back into the Bank of America account, and the expenditure of $3,750.00 in cash. (Def.'s Ex. 71.)

70.) However, Defendant learned at that time that he could not reincorporate Jennings Racing. (*Id.*)

On August 30, 2002, Defendant sold the Mad Max. (Pl.'s Ex. 48.) Although Defendant received the $594,539.00 net proceeds from the sale, the closing statement listed Jennings Racing as the seller. (*Id.*) On October 10, 2002, Plaintiff took Defendant's deposition in the Maxfield lawsuit at which Defendant testified that Jennings Racing was no longer in existence, had never formally been in existence, was never incorporated and held only a few of his personal assets which he had been removed from it. (Def.'s Ex. 15 at 1016.) Defendant testified that he didn't intend to "formally" wind Jennings Racing up but would "just let it dissolve by dissolution." (*Id.*) Defendant also testified that he had sold the Mad Max approximately a month earlier. (*Id.* at 1012.) On December 18, 2002, Defendant deposited the $594,539.00 net proceeds from the sale of Mad Max into his Bank of America account. (Tr. at 458–60; Def.'s Ex. 61.)

Defendant testified that he did not list Jennings Racing on his bankruptcy schedules because it "had been dissolved and was no longer an active company, had no value, had no address, and was not capable of doing business at that time." (Tr. at 74.) Defendant testified that he did not list the sale of the Mad Max on this SOFA because "I just-when I read this, I don't see where it says-when it says 'other than property transferred in the ordinary course of business or financial affairs,' I just though that was ordinary course of business for me to take my boat, sell it, put the money in the bank." (Pl.'s Ex. 147 at 282.)

### Raven Arms Profit Sharing Plan and Allstate IRA

Raven Arms, Inc. ("Raven Arms") was formed around 1970 by Defendant's father who was, during most of the time, the sole shareholder. (Def.'s Ex. 89 at 9; Tr. at 526.) Raven Arms had a profit sharing plan. Defendant was employed by Raven Arms and had an approximate $70,000.00 interest in the profit sharing plan. (Tr. at 526.) Defendant also owned an Allstate IRA worth approximately $5,000.00. Defendant resigned from Raven Arms in 1979 in order to start his own company, Jennings Firearms. Defendant testified that around that time he withdrew the $70,000.00 and the $5,000.00 from the respective accounts and used the money to fund his new business and to live on. (Tr. at 527–528.)

Defendant and Janice Jennings divorced on December 21, 1984. (Pl.'s Ex. 112.) Defendant's October 26, 1984 marital settlement agreement with Janice Jennings, which was incorporated into the judgment of dissolution, reflected his interests in the Raven Arms profit sharing plan and the Allstate IRA and valued them at $70,272.00 and $5,334.00, respectively. (*Id.*) Defendant testified that despite the fact that the interests no longer existed at that time, his attorneys listed them on the marital settlement agreement so that Janice Jennings could not make a claim against him. (Tr. at 103.)

### Payments from B.L. Jennings

Between December 31, 2001 and April 4, 2002, Defendant received six loan repayments from B.L. Jennings totaling $1,058,922.26. The payments were in the following amounts on the following dates: $214,172.26 on December 31, 2001, $194,750.00 on December 31, 2001, $100,000.00 on February 22, 2002, $225,000.00 on March 13, 2002, $125,000.00 on March 25, 2002 and $200,000.00 on April 4, 2002. (Def.'s Exs. 43, 44, 57, and 58.)

### Bank Accounts

Defendant deposited $1.65 million, the sum of the proceeds from the sale of the Mad Max and the six loan repayments from B.L. Jennings, into one of the following three accounts: 1) Wells Fargo Account No. 6612223131 (the "Wells Fargo account 131"); 2) Wells Fargo Account No. 083–2516470 (the "Wells Fargo account 470"); and 3) the Bank of America account. The following represents a transactional history of those accounts following the deposits.

### Wells Fargo account 131

On January 8, 2002, Defendant deposited the December 31, 2001 $214,172.26 and $194,750.00 B.L. Jennings loan repayments into Wells Fargo account 131. (Tr. at 435–38; Def.'s Exs. 42, 43 and 44.) The entire balance in Wells Fargo account 131 after this deposit was essentially disbursed by the following three transactions: 1) on February 5, 2002 Defendant withdrew $100,000.00 and deposited it into Wells Fargo account 470 (Tr. 438–39; Def. Exs. 46 and 47); 2) on February 14, 2002, Defendant wire-transferred $900,000.00 to AAA Title Insurance Company for the purchase of the Spruce Creek property (Tr. at 439; Def.'s Ex. 48); and 3) on March 1, 2002, Defendant wire-transferred $581,462.41 into the Bank of America account. (Tr. at 440–41; Def.'s Exs. 48 and 49.) Defendant closed Wells Fargo account 131 in March, 2002. (Tr. at 441.)

### Wells Fargo account 470

After the $100,000.00 deposit on February 5, 2002 from Wells Fargo account 131, Defendant paid $60,000.00 to Anna Leah Jennings' for alimony which reduced the balance to $48,722.84. (Tr. at 442; Def.'s Exs. 47 and 50.) On February 22, 2002, Defendant deposited the February 22, 2002 $100,000.00 loan repayment into Wells Fargo account 470. (Tr. at 443–45; Def.s Ex. 51.) After this deposit, Defendant withdrew $16,637.73 during February, 2002 by writing checks to specific payees except for a $10,000.00 check to cash dated February 28, 2002. (Tr. at 445–6; Def.'s Ex. 51.) During March, 2002, Defendant wrote checks totaling $187.46. (Def.'s Ex. 52) During April, 2002, Defendant wrote checks totaling $71,225.89–$46,225.89, which was paid to the Internal Revenue Service and $25,000.00, which was paid for the WACCO aircraft. (Def.'s Ex. 53.) This reduced the balance as of May 15, 2002, to $60,694.76. (Id.) There was no further material activity until June 27, 2002, when Defendant withdrew $60,000.00 and loaned it to B.L. Jennings. (Tr. at 448–449; Def.'s Exs. 54, 55 and 9.) This withdrawal reduced the balance to $681.28. (Tr. at 450; Def.'s Ex. 55.) There were no deposits made into Wells Fargo account 470 after this time. It was closed on June 18, 2003. The closing balance was $492.05. (Tr. at 449–50; Def.'s Ex. 56.)

### Bank of America account

On March 28, 2002, Defendant deposited the March 25, 2002 $125,000.00 loan repayment and the March 13, 2002 $225,000.00 loan repayment into the Bank of America account, except for $10,000.00 in cash, which Defendant withdrew from the deposit. (Tr. at 450–453; Def.'s Exs. 57, 58, 59 and 88.) On April 9, 2002, Defendant deposited the April 4, 2002 $200,000.00 loan repayment into his Bank of America account. (Tr. at 453–54; Def.'s Exs. 59, 60.) The $594,539.00, the three loan repayments described above and the $581,462.41 wire transferred from Wells Fargo account 131 on March 1, 2002 were the only material deposits Defendant made into his Bank of America account except for the deposits of $17,000.00 on May 12, 2003 and $20,000.00 on May 13, 2003. (Tr. at 461–462; Def.'s Exs. 49, 59, 61, 62, 77, 86 and 87).

The parties stipulated at trial that if the payee on the check was someone other than cash, then the check explains where the money was spent. (Tr. at 455–46.) In addition to the March 28, 2002 $10,000.00 cash withdrawal and the May 7, 2003 $100,012.48 cash withdrawal, Defendant made the following cash withdrawals from the Bank of America account beginning on the date he deposited the proceeds from the sale of the Mad Max and the B.L. Jennings loan repayments:

$10,000.00 on April 26, 2002

$6,000.00 on May 14, 2002

$7,000.00 on May 30, 2002

$11,943.75 on July 31, 2002

$10,000.00 on August 15, 2002

$10,000.00 on January 24, 2003

$10,000.00 on January 31, 2003

$10,000.00 on March 31, 2003

$10,000.00 on April 18, 2003

(Pl.'s Ex. 131; Def.'s Ex. 77.)

Of the May 7, 2003 $100,012.48 cash withdrawal, Defendant accounted for all but $3,750.00. Defendant produced a $3,000.00 receipt dated July 23, 2002 from the New Hair Institute and an approximate $12,000.00 receipt dated February 3, 2003 from a plastic surgeon. (Def.'s Exs. 72 and 64.) Defendant did not account for the disposition of the remaining cash which he withdrew. Defendant testified to the following. He did not carry a checkbook or keep check registers. His practice was to carry and use cash to pay personal expenses such as dating, hotel rooms, restaurants, airplane fuel, yacht fuel and maintenance, expenses related to his other boats and collector cars, clothing and groceries. He normally obtained the cash by making large withdrawals from his bank accounts by writing checks to "cash". It was not his practice to keep receipts for personal items that he paid cash for be-

cause there was no reason for him to do so.

## CONCLUSIONS OF LAW

Plaintiff seeks a denial of Defendant's discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), and (a)(5). The Bankruptcy Code favors discharge of the honest debtor's debts and provisions denying this discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. *See Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 487 (Bankr.M.D.Fla.1998). However, there are limitations on the right to a bankruptcy discharge. Federal Rule of Bankruptcy Procedure 4005 provides that the initial burden of proof on an objection to discharge lies with the plaintiff. Fed. R.Bankr.P. 4005. A plaintiff bears the initial burden of proving, by a preponderance of the evidence, that a debtor's discharge should be denied. *See Grogan v. Garner*, 498 U.S. 279, 285–91, 111 S.Ct. 654, 112 L.Ed.2d 755; *Hawley v. Cement Indus., Inc. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir.1995); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *Manhattan Leasing Sys., Inc. v. Goblick (In re Goblick)*, 93 B.R. 771, 775 (Bankr.M.D.Fla.1988). However, once a plaintiff meets the initial burden, the debtor has the ultimate burden of persuasion. *See id.* That is, the debtor must bring forth "enough credible evidence to dissuade the court from exercising its discretion to deny the debtor's discharge based on the evidence presented by the objecting party." *Law Offices of Dominic J. Salfi, P.A. v. Prevatt (In re Prevatt)*, 261 B.R. 54, 58 (Bankr.M.D.Fla.2000).

### Count I

Count I of the Second Amended Complaint sought a denial of Defendant's discharge pursuant to §§ 727(a)(2), 727(a)(3),

and 727(a)(4). Plaintiff alleged that Defendant withdrew approximately $244,500.00 (comprised of the May 5, 2003 $130,000.00 payment to Baker Builders, the May 7, 2003 $100,012.48 withdrawal, and the May 14, 2003 $14,498.06 withdrawal) during the "week" (sic) leading up to the Petition Date. Plaintiff asserted that Defendant failed to account for $44,500.00 of the $244,500.00.[5] Plaintiff also asserted that the transfer of $174,500.00 (comprised of the $130,000.00 payment to Baker Builders and the $44,500.00 to cash) was made with the intent to hinder, delay or defraud creditors. As the Court explained in the Findings of Fact, Defendant used $14,498.06 to purchase a cashier's check payable to Pino Tile and to pay his Chase Credit Card. Defendant also deposited $17,000.00 into his Bank of America account on May 12, 2003. Finally, Defendant spent approximately $9,300.00 at Kane's Furniture, Stone Giant, and Circuit City between May 10, 2003 and the Petition Date. Taking these expenditures into account, Defendant accounted for all but $3,750.00 of the $244,500.00. The Court will address whether Defendant's lack of receipts to account for the $3,750.00 warrants a denial of his discharge pursuant to § 727(a)(3) when it deals with Count V. The remaining issues in Count I are whether Defendant's transfer of: 1) $130,000.00 to Baker Builders and 2) $3,476.97 cash for payment to Stone Giant for countertops on May 11, 2003, and $5,448.18 cash for payment to Pino Tile on the Petition Date warrant a denial of his discharge pursuant to § 727(a)(2). Because these issues are subsumed within Count II of the second

amended complaint, the Court will address them in the next section.

### Count II

Plaintiff asserts that Defendant's $130,000.00 payment to Baker Builders and the improvements to Spruce Creek during the year preceding the bankruptcy petition were made with the intent to hinder, delay, or defraud Plaintiff and therefore warrant a denial of his discharge pursuant to § 727(a)(2).[6]

■ Section 727(a)(2) of the Bankruptcy Code provides for denial of a debtor's discharge if:

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

The conversion of non-exempt assets into exempt assets within one year prior to the filing of a bankruptcy petition with the intent to hinder, delay, or defraud creditors warrants denial of a debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(a). *In re Barker*, 168 B.R. 773 (Bankr.M.D.Fla.1994).

■ The Court first addresses whether Defendant made the $130,000.00 payment

---

5. Plaintiff arrived at the $44,500.00 figure by subtracting from the $244,500.00 the $130,000.00 that was paid to Baker Builders, the $20,000.00 that was deposited into the Bank of America account and used to pay attorney's fees, and the $50,015.00 which Defendant reported as cash on hand on his Schedule B.

6. Plaintiff acknowledges that because Defendant purchased the Spruce Creek property more than a year prior to the filing of the petition, he should not forfeit his discharge on that basis.

to Baker Builders with the intent to hinder, delay or defraud creditors. Defendant asserts that he paid the $130,000.00 upon his return from Europe because he observed that construction on the hangar had not begun and he wanted it to start right away. Upon a review of Baker's deposition testimony and the contract, the Court finds Defendant's testimony regarding his May 4 or May 5, 2003 conversation with Baker to be not credible. Specifically, the Court does not believe that Baker told Defendant he had not begun the work because Defendant had not given him any (more) money especially in light of the fact that Baker had not obtained the permit to begin construction of the hangar[7] and Baker had only spent $651.52 on the project up to that point.

However, even assuming for purposes of argument that Defendant truly believed work on the hangar had not begun because Baker Builders was awaiting an additional payment, the Court finds that such a belief might justify a $50,000.00 payment but not a $130,000.00 one. The Court does not find Defendant's testimony that he and Baker negotiated the $130,000.00 payment to be credible. Baker's testimony makes clear that: 1) he expected and communicated to Defendant that the project would be completed in $50,000.00 installments; 2) Defendant's decision to pay the $130,000.00 was his alone rather than the product of any negotiations; and 3) he did not understand how Defendant decided upon the $130,000.00 figure. Additionally, Defendant's explanation that he paid the $130,000.00 because he didn't want to be burdened with managing the hangar construction from California is not convincing to the Court. Finally, in light of Baker's testimony that he never suggested to De-

fendant that Defendant would realize a cost savings if he paid the $130,000.00, the Court does not find credible Defendant's explanation that he paid the $130,000.00 to save money on the project.

The Court finds that Defendant's unusual sense of urgency in obtaining and delivering the cashier's check to Baker Builders was to keep the money out of the hands of his creditors rather than to jump start or to save money on the project. Although Defendant contends that he did not decide to file bankruptcy until after the entry of the damages verdict on May 7, 2003, the Court finds Defendant was seriously contemplating it beginning on April 21, 2003, the date of the liability verdict. Moreover, while the Court makes no explicit finding that Defendant's withdrawal of $100,012.48 two days later, standing alone, warrants a denial of his discharge, the Court finds that it is additional circumstantial evidence of Defendant's state of mind in the days leading up to the petition date. The Court finds that Defendant made the $130,000.00 payment to Baker Builders with the intent to hinder, delay or defraud creditors.

█ The Court now turns to the improvements made to the Spruce Creek property during the year prior to the filing of the petition. Defendant testified he knew when he bought the Spruce Creek property that it needed a lot of updating and freshening up to fit his personal needs and tastes and that he would not have bought the property if he could not have done the work. The Court recognizes that every dollar Defendant used to make improvements to the Spruce Creek property is a dollar that will not go to his creditors. However, the Court finds that Defendant made improvements to the Spruce Creek property during the year prior to the Peti-

---

7. While Defendant may not have known the permit had not been issued, Baker certainly did.

tion Date to make it more comfortable for living purposes, not to keep it out of the hands of creditors.

### Counts III and IV

Counts III and IV of the Second Amended Complaint seek a denial of Defendant's discharge under § 727(a)(4) as a result of the following: 1) Defendant's failure to list the transfer of the Mad Max in response to paragraph 10 of his Statement of Financial Affairs;[8] 2) Defendant's failure to list his interest in Jennings Racing, Inc. on his Schedule B of his bankruptcy schedules and his Statement of Financial Affairs; and 3) Defendant's failure to list his interests in a retirement fund with Raven Arms and an IRA with Allstate.[9]

Section 727(a)(4)(A) provides for denial of a debtor's discharge if he "knowingly and fraudulently, in or in connection with the case—made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The purpose of § 727(a)(4)(A) is to ensure that "that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." Boroff v. Tully (In re Tully), 818 F.2d 106, 112 (1st Cir.1987). Section 727(a)(4)(A) requires a court to find that the debtor knowingly made a false oath that was both fraudulent and material. See Swicegood v. Ginn (In re Ginn), 924 F.2d 230 (11th Cir.1991). To be fraudulent, the oath must be made with "a knowing intent to defraud creditors." Parnes v. Parnes (In re Parnes), 200 B.R. 710, 714 (Bankr.N.D.Ga. 1996) (citing Swicegood, 924 F.2d at 232).

For a false oath to be considered material, it must be shown that it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Chalik, 748 F.2d at 618 (citations omitted). A creditor objecting to discharge has the burden of producing sufficient evidence to "give rise to a reasonable inference that the debtor failed to disclose information with the intent to hinder the investigation of the trustee and creditors." Prevatt, 261 B.R. at 59 (citing Chalik, 748 F.2d at 619). The burden then shifts to the debtor to overcome the inference with credible evidence. Id.

Initially, the Court notes that Plaintiff failed to prove that the Raven Arms profit sharing plan and the Allstate IRA existed

---

8. Count III of the Second Amended Complaint also seeks a denial of Defendant's discharge pursuant to § 727(a)(3). In light of the fact that Plaintiff failed to argue in his brief that Defendant's omission of the Mad Max from his SOFA somehow violated § 737(a)(3), the Court deems that portion of Count III abandoned and will not address it in these Findings of Fact and Conclusions of Law.

9. In Count IV of the Second Amended complaint Plaintiff alleged that Defendant failed to disclose in his petition a number of other assets. Additionally, Plaintiff states in his brief (but does not allege or argue fraud) that Plaintiff failed to list (i) on his schedules, a security interest in a Citation Jet and Team Warlock, Inc, and (ii) on his statement of affairs, (a) loans to B.L. Jennings in the year preceding the petition date and (b) his status as trustee of the Rhonda Jennings Trust and the Gail Jennings Trust. In light of the fact that Plaintiff failed to argue in his brief that any of these omissions constitute fraud, the Court deems the allegations abandoned and will not address them in these Findings of Fact and Conclusions of Law.

on the petition date. Even assuming for purposes of argument that the plans existed in 1984, there is no evidence that they existed at any time after that. Accordingly, the Court finds that Defendant's failure to list them on his bankruptcy schedules is not a false oath or account.[10]

■ The Court finds that Defendant's failure to list the transfer of the Mad Max in response to item 10 of his SOFA is a material omission. However, the Court finds that Plaintiff failed to produce sufficient evidence to give rise to an inference that Defendant failed to disclose the information with the intent to hinder creditors. The Court finds Defendant's testimony that he believed the sale of the Mad Max was in the ordinary course of business and was therefore not required to be listed in response to Item 10 on the SOFA to be convincing. Moreover, the Court finds that given the circumstances of this decidedly two-party dispute with the other party being a particularly diligent creditor, Defendant's disclosure during his October 10, 2002 deposition that he had sold the Mad Max militates against an inference that he intentionally omitted it from his SOFA.

The Court finds that Defendant's failure to list his interest in Jennings Racing, Inc. in response to item 12 of his SOFA and his Schedule B are material omissions. However, as with the Mad Max, the Court finds that Plaintiff failed to produce sufficient evidence to give rise to an inference that Defendant failed to disclose the information with the intent to hinder creditors. Jennings Racing never issued stock certificates, never conducted any business, and

never had a permanent address. Additionally, Defendant's testimony during his October 10, 2002 deposition that Jennings Racing was no longer in existence, had never formally been in existence, was never incorporated and held only a few of his personal assets which had been removed from it militates against an inference that he intentionally omitted it from his schedules.

### Count V

Count V of the Second Amended Complaint seeks a denial of Defendant's discharge under 11 U.S.C. §§ 727(a)(3) and (a)(5) on the basis that he failed to account for a substantial portion of $1.65 million flowing through his bank accounts between January 1, 2002 and the Petition Date. Specifically, Plaintiff contends that Defendant failed to document the expenditure of approximately $209,000.00, which came into his possession since December 17, 2001.

### § 727(a)(3)

■ Section 727(a)(3) of the Bankruptcy Code provides for the denial of a debtor's discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;" The purpose of Section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the

10. In his post-trial memorandum Plaintiff for the first time asserts that Defendant's failure to produce documentation such as an account statement, a tax return, a letter to the broker, a cancelled check, bank records or the like to corroborate his testimony that the plans were liquidated warrants a denial of his discharge pursuant to § 727(a)(5). The Court finds that Plaintiff is estopped from raising this argument for the first time in his post-trial submission. In any event, the Court finds that Defendant's failure to produce such records does not warrant a denial of his discharge.

status of a debtor's affairs and to test the completeness of the disclosure requisite to a discharge. *See PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 95 (Bankr. W.D.Pa.2000) (citing *Meridian Bank v. Alten (In re Alten)*, 958 F.2d 1226 (3d Cir. 1992)). This statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history. *See Meridian Bank*, 958 F.2d at 1230 (citations omitted). "Section 727(a)(3) does not require a full accounting of every business transaction, but 'there should be some written records, orderly made and preserved, from which the present and past financial condition of the debtor may be ascertained with substantial completeness and accuracy.' " *In re Khanani*, 2005 WL 2482392 *6 (Bankr.M.D.Fla. September 27, 2005) quoting *In re Sowell*, 92 B.R. 944, 947 (Bankr.M.D.Fla.1988). The failure to keep records must be determined on a case by case basis, and a debtor's failure to keep records is not an absolute bar to a discharge. *In re Bryant*, 1997 WL 375692 *3 (Bankr.M.D.Fla. April 30, 1997). A creditor objecting to a discharge under § 727(a)(3) has the initial burden of proving "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Meridian Bank*, 958 F.2d at 1232. Once a creditor shows that a debtor's records are inadequate, the burden shifts to the debtor to justify such inadequacies. *Id.* at 1233.

 Initially, the Court notes that it was unable to determine how Plaintiff arrived at the $209,000.00 figure. Upon a thorough review of Defendant's bank statements and the two receipts, the Court finds that with the exception of approximately: 1) $90,000.00 in cash (the approximate $105,000.00 in cash withdrawals reduced by the two receipts totaling $15,000.00) which Defendant withdrew between February, 2002 and April, 2003 and 2) $3,750.00 cash from the May 7, 2003 $100,012.48 withdrawal, Defendant's records demonstrate how the entire $1.65 million was spent. The issue is whether Defendant's failure to keep receipts documenting his remaining cash expenditures warrants a denial of his discharge pursuant to 727(a)(3). The Court finds that it does not. The Court finds that Defendant's bank statements from 2000 to 2002 permit a creditor to ascertain with substantial completeness and accuracy Defendant's present and past financial condition. To the extent that the absence of the receipts for cash expenditures renders Defendant's records inadequate, the Court finds that Defendant justified such inadequacy. The Court finds credible Defendant's explanation that it was his longtime practice not to maintain receipts for cash expenditures for personal expenses such as dating, hotel rooms, restaurants, airplane fuel, yacht fuel and maintenance, expenses related to his other boats and collector cars, clothing and groceries because there was no benefit in doing so. The Court will not deny Defendant's discharge pursuant to § 727(a)(3).

### 727(a)(5)

 Pursuant to Section 727(a)(5), "once it has been established that the debtor has a cognizable ownership interest in a specific identifiable property at any given time not too far removed in time from the date of filing his petition, the burden shifts to the debtor to explain satisfactorily the loss of that particular asset if at the time the petition is filed, the debtor claims that it no longer has the particular property." *Manhattan Leasing Systems, Inc. v. Goblick (In re Goblick)*, 93 B.R. 771, 775 (Bankr.M.D.Fla.1988). For a debtor's explanation to be satisfactory,

the explanation must "convince the judge." *Chalik,* 748 F.2d at 619 (citations omitted). "Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." *Id.* The Court finds that Defendant satisfactorily explained the disposition of the loan repayments from B.L. Jennings and the proceeds from the sale of the Mad Max. Accordingly, the Court will not deny Defendant's discharge pursuant to § 727(a)(5).

### CONCLUSION

Because Defendant paid $130,000.00 to Baker Builders for the construction of a hangar nine days prior to the filing of his bankruptcy petition with the intent to hinder, delay, or defraud creditors, the Court will deny Defendant's discharge pursuant to 11 U.S.C. § 727(a)(2). Defendant's improvements to his house during the year leading up to the filing of his bankruptcy petition were for the purpose of making it more comfortable for living purposes, were not made with the intent to hinder, delay or defraud creditors, and do not warrant a denial of his discharge pursuant to § 727(a)(2). Although Defendant failed to list certain assets on his bankruptcy schedules, he did not do so with the intent to hinder the investigation of creditors. The Court will not deny Defendant's discharge pursuant to § 727(a)(4). In light of Defendant's long standing practice of not maintaining receipts for cash expenditures, Defendant's failure to maintain receipts to account for the expenditure of approximately $90,000 in cash during the approximate fifteen months leading up to the filing of his bankruptcy petition does not warrant a denial of his discharge pursuant to § 727(a)(3). Because Defendant satisfactorily explained the disposition of the approximate $1.65 million he received from the sale of the Mad Max and the loan repayments from B.L. Jennings, the Court will not deny his discharge pursuant to § 727(a)(5). The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.